UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>) | Docket No. 19-CR-10431-WGY |
| v. )<br>) | |
| KESYI BATISTA ) | |

### **DEFENDANT KEYSI BATISTA'S SENTENCING MEMORANDUM**

Defendant Keysi Batista ("Mr. Batista"), by and through his undersigned attorney, hereby submits the following memorandum for the Court's consideration at his December 8, 2020, sentencing in the above-captioned matter. As explained in further detail below, Mr. Batista respectfully submits that, after consideration of all of the factors under 18 U.S.C. § 3553(a), a sentence of sixty (60) months of incarceration – a term of five years – plus an additional four-year period of supervised release would be sufficient, but not greater than necessary, to achieve the purposes of sentencing in this case.

Mr. Batista further requests that this Court recommend that he be assigned to a facility where he can participate in an intensive, 500-hour drug treatment program that offers him a full range of substance abuse and other counseling. Admission to such a program would provide him with greater ability to address his personal challenges and to return to his family with a chance to lead a productive and healthy life after his release from incarceration.

**THE DEFENDANT'S PERSONAL HISTORY**

Mr. Batista's personal background is summarized in the Pre-Sentence Report ("PSR"). See PSR ¶¶ 38-51. He was born in the Dominican Republic on December 7, 1988. Id. ¶ 38. In the late 1990s, Mr. Batista emigrated to the United States to join his father, who had emigrated to the United States earlier. Id. ¶ 40. Thereafter, Mr. Batista was raised in Lawrence, Massachusetts by his father and his stepmother. Id. ¶ 41. In 2003, at the age of fifteen, he and his father became United States citizens. Id. at page 2 & Addendum. Mr. Batista's relationship with his father and his step-family was strained and difficult during this period of his childhood, and Mr. Batista often felt isolated due to the fact that he was left to live with his father, who had "a whole other family" that Mr. Batista had not previously known. Id. ¶¶ 40-41. To this date, Mr. Batista still does not have much of a relationship with his stepmother or his much younger stepbrother. Id. ¶¶ 41, 45.

In approximately 2005, at the age of sixteen, Mr. Batista left his father's home and moved in with an older cousin, Jeffrey Melo, in Methuen, Massachusetts. Id. ¶42. Mr. Batista soon developed close relationships with Mr. Melo and his wife and children, and they continue to be an important part of his support network today. Id. During this same period, Mr. Batista attended and ultimately obtained his high school diploma from Whittier Technical School in Haverhill, Massachusetts. Id. ¶ 57.

Around this same time, in his mid- to late-teens, Mr. Batista began experimenting with alcohol, marijuana and some other controlled substances. Id. ¶ 54. For a period of time, he used marijuana daily. Id. Eventually, Mr. Batista's substance abuse habits became increasingly focused on alcohol, as he began drinking significant amounts on a weekly basis and regularly drinking to excess. Id. Mr. Batista's drinking issues have had an adverse impact on his personal

relationships, and he is open and eager for more substance abuse treatment during his incarceration. Id. Mr. Batista would also like to receive additional counselling to help him work through his childhood issues. Id. ¶ 54. His hope is that, in addition to helping him address his substance abuse issues, such counselling will help him become a better father. Id.

In May 2012, at the age of twenty-three, Mr. Batista was arrested and charged with distribution of heroin and cocaine in Haverhill, Massachusetts. Id. ¶ 27. In June 2013, he pled guilty to those distribution charges, and was sentenced to two and one-half years of incarceration, with a portion of the sentence suspended. Id. In July 2015, Mr. Batista was again arrested and charged with distribution of heroin and cocaine in Andover, Massachusetts. Id. ¶ 29. In 2017, he plead guilty to those charges and was sentenced to an additional two years in state prison. Id.

Notwithstanding these significant legal difficulties, Mr. Batista has been able to consistently maintain employment for most of his adult life. Commencing in approximately 2010 and continuing until his arrest in connection with this matter, Mr. Batista has worked as a manager and service writer for Moreno Auto Repair in Lawrence, Massachusetts. See PSR ¶ 58. While he understands that he is facing a period of incarceration in connection with this matter, Mr. Batista is hopeful that he will be able to return to work at Moreno Auto Repair or at a similar business after his release. Mr. Batista has also worked periodically as a part-time commercial janitor during the past decade in order to earn additional income for himself and his family. Id.

Finally, and perhaps most significantly, since 2016, Mr. Batista has been in a long-term, committed relationship with Daribel Rodriquez, with whom he was residing in Lawrence, Massachusetts, prior to his arrest. Id. ¶ 47. Ms. Rodriguez works full-time as a personal health care attendant. Id. ¶ 48. Ms. Rodriguez describes Mr. Batista as "her 'everything,' and someone

3

who helps her in every way." Id.  Mr. Batista is extremely close to and is a father figure to Ms. Rodriguez's older child from a prior relationship, who suffers from certain disabilities. Id. ¶ 50. Ms. Rodriguez describes Mr. Batista as "a wonderful father who treats his stepdaughter as his own." Id. ¶ 48.

In July 2019, after the events that are the subject of this case, Mr. Batista and Ms. Rodriguez welcomed their first child, a daughter. Id. ¶ 49. The arrival of his daughter marked a dramatic and significant change in Mr. Batista's life. While his relationship with his father previously had been strained, the birth of Mr. Batista's daughter has led to a significant reconciliation, and he now considers his father to be a "very good grandfather." Id. ¶ 43. Similarly, the birth of his daughter has brought Mr. Batista closer to his own mother, with whom he has not lived since he was a young boy. Id. ¶ 44. As Mr. Batista explains, "the birth of his daughter has helped bring the family together." Id. Not surprisingly, Mr. Batista's sole focus now is to complete what he knows will be a difficult period of incarceration and to return to his young and newly reunited family as soon as possible.

The significance of Mr. Batista's relationship with his family and new daughter is reflected throughout the collection of letters that have been submitted by various friends and family members along with this memorandum. See Defendant Keysi Batista's Letters of Support (hereinafter "Letters of Support) (filed concurrently), *passim*. Mr. Batista's close cousin, Jeffrey Melo, writes that Mr. Batista "is a great father to his one-year-old baby girl and stepdaughter" and that he "loves his family beyond anything in this world." Id. at Ex. A. Kaira Cabrera, a friend and case manager for homeless individuals in Lawrence, references Mr. Batista's "beautiful daughter" and expresses hope that she will have her father present during her childhood. Id. at Ex D. Another friend, Michelle Espinal, similarly describes Mr. Batista as "a

4

devoted boyfriend and father of a one-year old baby girl that loves him beyond any words can explain." Id. at Ex. B. Pablo Henriquez describes Mr. Batista as someone who "has always been present with his friendships [and] with his relationship with his daughter and stepdaughter." Id. at F. Ms. Dyana Torres, another close friend, similarly attests to the deep love that Mr. Batista has demonstrated towards his young and newly-expanded family. Id. at Ex. D.

## THE OFFENSE CONDUCT

The offense conduct that is the subject of the Indictment in this case is described in ¶¶ 6-8 of the PSR. Essentially, those facts demonstrate that on August 10, 2017, and again on November 2, 2018, in Lawrence, Massachusetts, Mr. Batista sold approximately 50 grams of fentanyl (for a total of 100 grams) to an FBI confidential informant. Investigating agents did not arrest Mr. Batista after either of these two controlled transactions, both of which were initiated by the confidential informant. PSR ¶¶ 6-8. Instead, agents waited for more than a year—until November 15, 2019—to arrest Mr. Batista and charge him with these two offenses. Although the government investigation in connection with this matter apparently continued throughout the period between November 2018 and November 2019, Mr. Batista is not charged with engaging in any other wrongdoing during that additional year.

On September 14, 2020, Mr. Batista entered a plea of guilty to both counts in the two-count Indictment in this case. The two counts relate to the two transactions describe above, and each count charges Mr. Batista with Distribution of and Possession with Intent to Distribute 40 grams or More of Fentanyl, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(vi).

# THE SENTENCING GUIDELINES

Although there is no plea agreement in this case, there does not appear to be any dispute between the parties regarding the calculations of the Defendant's offense level or criminal history points under the United States Sentencing Guidelines. Pursuant to U.S.S.G. § 2D1.1(c)(12), the base offense level applicable to Mr. Batista, based upon the total of approximately 101 grams of fentanyl involved in the two transactions, is **24.** PSR ¶ 15. In the ordinary course, after a three-point reduction resulting from his acceptance of responsibility, his total offense level would be **21**. Id. ¶¶ 22-23. In addition, Mr. Batista has a criminal history score of nine (9) points, resulting in a criminal history category of IV. Id. ¶ 32.

Absent any other guideline provisions, Mr. Batista's combination of a criminal history category IV with a total offense level of 21 would result in a guideline sentencing range of **60[1] to 71 months** for Mr. Batista. See U.S.S.G., Ch. 5, Part A. Such a sentence—even one at the low end of that guideline range—would be a significant and serious sentence for Mr. Batista and would separate him from his family for a lengthy period of time.

Unfortunately for Mr. Batista, however, the Sentencing Guidelines offer an additional twist. Specifically, due to his two prior drug-related convictions, see PSR ¶¶ 27, 29, Mr. Batista's guideline calculation is affected by the "career offender" guideline, U.S.S.G. § 4B1.1. See PSR ¶¶ 21, 33. The impact of the "career offender" provision upon Mr. Batista in this case is dramatic: it increases Mr. Batista's final offense level by ten (10) full levels from 21 to 31, and it converts his criminal history category from IV to VI. Id. ¶¶ 21, 33. As a result, Mr. Batista's applicable sentencing guideline range increases from **60-71 months** to a staggering **188-235**

---

[1] Although the applicable range for a Defendant with a final offense level of **21** and a Criminal History Category of IV is 57-71 months, a five-year (60 month) mandatory minimum sentence is applicable to the offenses with which Mr. Batista is charged in this case. See PSR ¶ 62; see also 21 U.S.C. § 841(a)(1) and (b)(1)(B)(vi).

**months**. Id. ¶ 133. As a result, instead of a facing an advisory guideline sentence of approximately five to six years, Mr. Batista may be facing a guideline sentence in this case ranging between approximately fifteen and nearly twenty years. Id.

**ARGUMENT**

Mr. Batista respectfully submits that a sentence based primarily upon the application of the "career offender" guideline in this case would result in an unreasonable sentence that is far greater than what is necessary to comply with the purposes set forth in 18 U.S.S.C. § 3553(a). Accordingly, Mr. Batista requests that this Court impose a sentence of sixty (60) months – a serious and significant sentence that Mr. Batista submits would appropriately balance the various policy goals identified in the sentencing statute.

    **A. This Court May Properly Impose a Sentence Outside the Sentencing Guideline Range, after Consideration of the Factors Set forth in 18 U.S.C. § 3553(a).**

As an initial matter, there is no doubt that this Court has the discretion to impose a sentence that varies from the sentencing range reflected by the sentencing guidelines calculations. See United States v. Gall, 552 U.S. 38, 51-52 (2007); United States v. Martin, 520 F.3d 87, 90-91 (1st Cir. 2008). While the sentencing guidelines calculations are certainly an important factor that must be calculated and considered in connection with a defendant's sentencing, see Martin, 520 F.3d at 91; see also 18 U.S.C. § 3553(a)(4-5), they are far from the only relevant factor for this Court to consider. Other important factors include consideration of the nature and characteristics of the defendant, the need for the sentence to provide the defendant with correctional treatment in the most effective manner, and the need to avoid unwarranted sentencing disparities. See 18 U.S.C. § 3553(a)(1-3, 6).[2] Accordingly, this Court may

---

[2] The "need to provide restitution to any victims," see 18 U.S.C. § 3553(a)(7), is not an issue in this case. See PSR ¶¶ 143-44.

7

appropriately vary from the guideline sentence in order to impose a sentence that is "sufficient, but not greater than necessary" to comply with the purposes set forth in the statue. Id. Indeed, once the Court has calculated the guidelines sentencing range, the sentencing process becomes "broad, open-ended, and significantly discretionary." Martin, 520 F.3d at 92 (citing United States v. Vega-Santiago, 519 F.3d 14, 20 (1st Cir, 2008)); see also United States v. Jones, 762 F. Supp. 2d 270, 281 (D. Mass. 2010), aff'd 689 F.3d 12 (1st Cir. 2012) (explaining that once the three steps to calculate the guideline sentence are completed, "it is the fourth step that is the most important. For it is during this step that a fair, impartial and individual sentence—mindful both of the needs of society and the circumstances of the individual offender—is hammered out pursuant to 18 U.S.C. § 3553(a).").

**B. A Sentence Based on the "Career Offender" Guideline in this Case Exceeds What is Necessary to Achieve the Sentencing Purposes Set Forth in 18 U.S.C. § 3553(a).**

Here, a projected guidelines sentence of 188 months or more is far greater than what is necessary to achieve a sentence that is "sufficient, but not greater than necessary" to achieve the purposes of the sentencing statute. 18 U.S.C. § 3553(a). Among other points, Mr. Batista notes that a sentence of 188 months would be more than three times greater than the mandatory minimum five-year sentence that Congress has established for a sale of 40 or more grams of fentanyl. See 21 U.S.C. § 841(b)(1)(B)(vi).

Moreover, while Mr. Batista does not dispute the relevance of his criminal record to this proceeding, he notes simply that his personal "history and characteristics" are not so egregious that such a lengthy sentence is merited. 18 U.S.C. § 3553(a)(1). There is no doubt that Mr. Batista had a challenging childhood, and that he struggled through some difficult transitions involving his family's circumstances and relocations. See generally PSR ¶¶ 38-42. At the same time, his personal history does not reflect any history of violence, nor does it reflect an individual

who has declined or failed to pursue educational or employment opportunities. Mr. Batista has maintained steady employment, and he has become a dedicated and devoted family man. See generally Letters of Support, *passim*. A mechanical application of the "career offender" guideline to Mr. Batista in this case would ignore these important facets of Mr. Batista's personal characteristics, and would leave Mr. Batista with a sentencing range identical to the sentencing range applicable to offenders with far more troubling personal histories and a greater number of prior serious convictions.

By way of example only, Mr. Batista notes that the two offenses which render him eligible for "career offender" status under U.S.S.G. § 4B1.1 reflect the minimum number of prior offenses required to trigger the "career offender" guideline" and neither involved a "crime of violence" as defined by that provision. See U.S.S.G. § 4B1.1(a). Another defendant with far more convictions (e.g. far more prior convictions for either crimes of violence or controlled substance offenses) committed and sentenced over a period of many years would be eligible for the very same "career offender" enhancement and would therefore be subject to the very same sentencing guideline range. As a result, a strict application of the guideline range in this case would create what courts have referred to as an unwarranted sentencing uniformity. See 18 U.S.C. § 3553(a)(6); accord United States v. Moreland, 568 F. Supp.2d 674, 688 (S.D.W.V. 2008) (varying from the guideline range established by the "career offender" guideline where "[t]wo relatively minor and non-violent prior drug offenses, cumulatively penalized by much less than a year in prison, vaulted this defendant into the same category as major drug trafficker engaged in gun crimes or acts of extreme violence").

Notably, the imposition of a sentence that is significantly lower than a guideline range influenced by the "career offender" guideline is far from unprecedented. See Jones, 762 F. Supp.

9

2d at 284 (noting that "the draconian sentences mandated by the career offender guidelines have been largely discredited in Massachusetts"); United States v. Whighara, 754 F. Supp. 2d 239, 247-48 (D. Mass. 2010) (distinguishing between "offenders who qualify for career offender treatment because of a life of violent crime" and those "who meet the Guidelines standard . . . because of a series of very minor drug charges[,]" and declining to impose sentence based on "career offender" guideline where application of guideline overstated defendant's status and would have resulted in unwarranted sentencing disparities); see also United States v. Lacy, 99 F. Supp. 2d 108, 122 (D. Mass. 2000), aff'd sub nom United States v. Dedrick, 16 F. App'x 10 (1st Cir. 2001) (citing United States v. Hammond, 37 F.Supp.2d 204 (E.D.N.Y.1999) with approval for its analysis that application of the criminal offender guidelines would overstate a defendant's criminality); United States v. Newhouse, 919 F. Supp. 2d 955, 967 (N.D. Iowa 2013) (holding that it will "join the growing chorus of federal judges who have rejected applying the Career Offender guideline in certain cases[,]" and summarizing such cases); United States v. Peterson, 2013 WL 142478, *29 (D.N.M. Jan. 7, 2013) (varying from guideline range where the court found that "the career offender enhancement substantially overstates [the defendant's] criminal history"); United States v. Merced, 2010 WL 3118393, *2 (D.N.J., Aug. 4, 2010) (granting variance from "career offender" guideline based on defendant's specific circumstances rather than as a policy-based variance); United States v. Woody, 2010 WL 2884918, *9 (D. Neb., July 20, 2010) (declining to impose a sentence based upon "career offender" guideline where doing so would result in an "excessively harsh" sentence); United States v. Patzer, 548 F. Supp.2d 612, 616-17 (N.D. Ill. 2008) (declining to apply "career offender" guideline where its application would result in sentence that was "in excess of the sentence required for deterrence"); Moreland,

568 F. Supp.2d at 688 (granting variance where application of the "career offender" guideline resulted in unwarranted sentencing disparity among different defendants).

Indeed, federal judges in this District have not infrequently departed or varied significantly from the "career offender" guidelines in instances where defendants had far more troubling personal histories than Mr. Batista. For example, in United States v. Jones, 2020 WL 6205783 (D. Mass., October 22, 2020), the Court noted that a defendant's four prior convictions for drug distribution offenses and his prior offense for threatening and assaulting the mother of one of his children had rendered him a "career offender" under the sentencing guidelines, resulting in a guideline range of 262-324 months. Id. at *2 & n.3. Despite these calculations, the Court had sentenced Mr. Jones to the applicable mandatory minimum sentence of ten years, a variance that was **142 months below** the advisory "career offender" guideline range. Id. Similarly, in United States v. Finch, 2020 WL 2079301 (D. Mass., April 30, 2020), the defendant, who had a "violent history" that included armed robbery, was deemed to be a "career offender" under the sentencing guidelines. Id. at *2. Notwithstanding that troubled history, the defendant in Finch had received a sentence of seventy-two (72) months of incarceration, **116 months below** the 188-235 month period established by the "career offender" guideline. Id. In United States v. Gomez, 2020 WL 1930471 (D. Mass., April 21, 2020), the Court described a defendant who had compiled a total of thirty (30) criminal history points, but who had received a sentence of eighty-seven (87) months, a sentence that was **101 months below** his "career

offender" guideline range of 188-235 months.  Id. at *2.³  Finally, in United States v. Jones, 762 F. Supp. 2d 270 (D. Mass. 2010), this Court sentenced a gang member and "prototypical career offender" to a period of incarceration of 120 months, a term which was **112 months below** the 232 months established by the low end of the "career offender" guideline range.

While Mr. Batista fully recognizes and appreciates that the final sentence determination in each case requires an individualized assessment by the Court of the particular offender and the particular crime, he respectfully submits that his personal history and characteristics are markedly less severe than the history and characteristics of any of the defendants involved in the above-referenced cases.  Accordingly, he respectfully submits that a sentence in this case based upon the career offender guideline would result in unwarranted sentencing disparities among defendants with criminal histories not dissimilar to his own.  18 U.S.C. § 3553(a)(6).  His proposed sentence of sixty (60) months would reflect a variance that is **128 months below** the low end of the "career offender" guideline in this case, see PSR ¶ 63, a variance that is generally consistent with the variances in the cases described above and which also reasonably reflects the genuine difference between Mr. Batista's personal history and characteristics and the more severe history and characteristics of the defendants in each of the above-referenced cases.

Mr. Batista further notes that his proposed sentence would result in a sentence that is not inconsistent with sentences that have been recently imposed by this Court upon other defendants who engaged in similar criminal conduct.  In United States v. Fouyolle, this Court sentenced a

---

³ Gomez involved a binding plea agreement submitted pursuant to Fed. R. Crim P. 11(c)(1)(C), but the Court in that case accepted the proposed disposition only after consideration of the applicable sentencing factors under 18 U.S.C. .§ 3553(a), including a finding that "a sentence within the guideline range based upon the Career Offender enhancement would invite unwarranted disparities in sentencing among defendants with criminal histories similar to this defendant.  See United States v. Gomez, Case No. 14-CR-10297-IT (D. Mass.), Judgment of October 13, 2015, Docket Entry #81 at 9.

12

defendant who was pled guilty to distribution of 40 grams or more of fentanyl—the same offense at issue in this case—to a period of incarceration of 75 months. See United States v. Fouyolle, 18-10408-WGY (D. Mass.), Judgment, Docket. No. 32 (entered July 11, 2019). Although the defendant in Fouyolle had fewer criminal history points (3) than Mr. Batista, he was also an alleged gang leader who had engaged in six separate transactions involving a total of more than 300 grams of fentanyl. Id., Government's Sentencing Memorandum, Docket No. 28 (filed June 11, 2019). Also potentially relevant here is United States v. Lara, where this Court recently imposed a sentence of 48 months upon a defendant who pled guilty to distribution of more than 400 grams of fentanyl. See United States v. Lara, 19-CR-10184-WGY, Amended Judgment, Docket No. 47 (filed July 13, 2020). While the defendant in Lara necessarily plainly had a significantly lower criminal history than Mr. Batista,[4] the total amount of fentanyl at issue (a total of 500 grams[5]) was plainly more significant than the amount at issue in this case.

Plainly, the sentences imposed by this Court in Fouyolle and Lara were deemed sufficient to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence to criminal conduct, and to protect the public. See 18 U.S.C. § 3553(a)(2)(A-C). Mr. Batista respectfully submits that his proposed sentence of sixty (60) months would achieve these same goals, and would strike a reasonable balance between the sentences imposed by this Court in Fouyolle and Lara, avoiding any unwarranted sentencing disparity, 18 U.S.C. § 3553(a)(6), while also assuring that the sentence appropriately accounts

---

[4] The defendant in Lara was apparently eligible for the safety-valve under U.S.S.G. § 5C1.2, as he avoided application of the ten-year mandatory minimum sentence that would have been otherwise applicable in that case.

[5] See United States v. Lara, 19-CR-10184-WGY, Transcript of Change of Plea Hearing of March 12, 2020, Docket Entry No. 56, at 17-18 (summarizing evidence).

for the nature and circumstances of the offense and Mr. Batista's personal history and characteristics. 18 U.S.C. § 3553(a)(1).

Finally, the Defendant's proposed sentence of sixty (60) months of incarceration would also serve the additional purpose of providing him with an adequate opportunity to receive training, care and other correctional treatment that will assist him in making an effective transition and preparing him for the future. 18 U.S.C. § 3553(a)(2)(D). Mr. Batista has acknowledged that he would benefit from substance abuse and other counseling, and he requests that this Court recommend that he participate in an intensive 500-hour substance abuse program. PSR ¶¶ 53-556. The five-year period of incarceration proposed here by Mr. Batista is sufficient to allow him to receive and benefit from such treatment, which will assist him when he re-enters society. At the same time, this proposed period of incarceration will provide Mr. Batista with adequate incentive and time to devote himself to these efforts and to prepare himself to provide for himself and his family upon his release.

## **CONCLUSION**

Mr. Batista had hoped that the birth of his daughter would mark the beginning of a new chapter in his life—that he could begin to flourish in his role as a father to his two young daughters, as a responsible and loving partner to his long-time girlfriend, and as central link in his newly reunited family. Unfortunately, before that new chapter can proceed, Mr. Batista must pay a significant and serious price for the misconduct that is the subject of this case. Mr. Batista recognizes and acknowledges the seriousness of his offenses, and he understands and appreciates that his actions have had consequences that have not only inflicted pain upon his family and friends, but have also seriously damaged the broader community in which he lives.

Given his current age (32 years old), Mr. Batista remains hopeful that, with the assistance of the resources of the Bureau of Prisons during his incarceration and the Probation Department during his term of supervised release, there will still be time for him to rebuild his life and to become a productive member of society and valued and reinvigorated source of support for his young and newly reunited family. A sixty-month sentence – while far harsher than any sentence he has previously served – would give him an opportunity to do just that.

For the foregoing reasons, Mr. Batista respectfully requests that this Court impose upon him a sentence of incarceration of sixty (60) months, to be followed by the required four-year term of supervised release. Mr. Batista further requests that, in connection with any sentence to be imposed, the Court recommend that Mr. Batista be placed in a facility that is as close as possible to his family in Lawrence, Massachusetts, and that the Court further recommend that he be admitted to a 500-hour substance abuse treatment program. Finally, in light of his inability to pay any fine, Mr. Batista respectfully requests that this Court decline to impose any fine in connection with this case, other than the mandatory $100 special assessment.

> Respectfully submitted,
>
> Keysi Batista,
> By his attorney,
>
> /s/ Daniel J. Cloherty
> Daniel J. Cloherty (BBO# 565772)
> Todd & Weld LLP
> One Federal Street
> Boston, MA  02110
> (617) 720-2626
> dcloherty@toddweld.com

Dated: December 3, 2020

## **CERTIFICATE OF SERVICE**

   I, the undersigned, hereby certify that I served a true copy of the above document upon all parties with an interest in this matter by electronically filing through this Court's CM/ECF filing system this 3rd day of December, 2020.

                /s/ Daniel J. Cloherty
                Daniel J. Cloherty